The Chancellor.
As to the construction of the deed from Thomas A. Hartwell to Alfred Camman, in reference to the interest which passed to the grantee, I have no doubt it was intended to convey to Camman an estate of inheritance in the mines. The words used are appropriate to the conveyance of such an estate, and such is the legal construction to be put upon the instrument. Such an estate in Camman is not inconsistent with the géneral title to the lands in which the mines are situated remaining in Hartwell, the grantor. The mines may form a distinct possession, or inheritance, from the lands. They are capable of living, and of being made the subject of *131 ejectment. Comyn v. Kyneto, Cro. Jac. 150; Barnes v. Mawson, 1 Maul and S. 77. When not thus severed from the general title of the lands in which they are situate, they are part of the lands or demesnes themselves, and will pass with the lands, without being expressly mentioned in the conveyance. The deed under consideration is in the usual form of a deed of bargain and sale. In the premises of the deed, the language of the grant, and description of the thing granted, is, “ doth give, grant, bargain, sell, and convey, unto the said party of the second part, his heirs and assigns for ever, the right, title, and interest in and to all mines and minerals opened, or to be opened, with free ingress and egress to the same for the purpose of mining in all its various branches, of, in, and to the following described tract of land,” &c. The language of the habendum and tenendum is as follows: “ To have and to hold all and singular the interests, right, and privilege of mining in and to the said lands and premises unto him, the said Albert Camman, his heirs and assigns for ever.” Then the covenants, that the grantor is the rightful owner; that the premises are unencumbered; that the grantor hath full power to grant, and that he will warrant and defend. Then follows this explanation or qualification: “ This agreement and this conveyance is upon this condition, that the said second party is not to have any right or privilege to said premises, other than for general mining purposes; that neither said second party, his heirs or assigns, shall cut, damage, or destroy any wood or timber on said premises, except it shall be actually necessary so to do for mining purposes, and in that case to pay a reasonable compensation to the said party of the first part, his heirs and assigns, for the same.” This condition, as it is called, neither contradicts, or is it repugnant to the estate before granted. The estate was clearly one of fee simple in the mines. The condition neither lessened, enlarged, or qualified that estate. It was nothing more than a further expression of the *132 intention of the parties, that nothing was intended to pass by the deed except the “mines and minerals,” and that the general title to the lands remained in the grantor.
Albert Camman subsequently conveyed the estate which he took in the mines and minerals to the defendants, “ the President and Directors of the Bridgewater Paint Manufacturing Company,” and they are now entitled to the enjoyment and to all the benefits of that estate.
If such be the correct construction of the deed, then the position taken by the defendants’ counsel, that Thomas A. Hartwell retained no further or other interest in the land except that reserved to him as to the wood and timber, and that he, or his assignee, has no right to carry away from off the land, for his own benefit, this substance which has given rise to this controversy, even if it is not embraced in what was conveyed to Camman, cannot be maintained. Camman took the estate in all the mines and minerals, and has a right to the possession of them and to their enjoyment, and to anything necessary and incidental to that enjoyment. The title to the lands where those “mines and minerals” are found remained in Hartwell, and he and his assignee are entitled to the enjoyment of everything else appertaining to those lands except the “mines and minerals.” If the material, then, which the defendants are carrying away, and converting to their own use, is a “mineral” which passed by the deed, the complainant cannot interfere with the right of ownership which the defendants are exercising. If it is not a “ mineral,” in the sense intended by the parties, then the complainant has rightfully invoked the aid of this court, and he himself is entitled to the enjoyment of the material, and may enter upon the land, and collect and convert the material in it to his own exclusive use.
Did this material pass with the estate conveyed to Camman ? If it is embraced within the terms “ mines and minerals” it did, otherwise it did not.
*133 I admit that I have experienced very great embarrassment in giving an answer to this question satisfactory to myself. Perplexed with doubts, I found I could only extricate myself from difficulty by making most of the maxim, “ The words of an instrument shall be taken most strongly against the party employing them.” Co. Litt. 36, a.
By the use of the terms “ mines and minerals,” it is clear the grantor did not intend to include everything embraced in the mineral kingdom, as distinguished from what belongs to the animal and vegetable kingdoms. If he did, he parted with the soil itself. Such a construction would be inconsistent with, and repugnant to the whole tenor of the grant. Nor can I see any more propriety in confining the meaning of the terms used to any one of the subordinate divisions into which the mineral kingdom has been subdivided by chemists, either earthy, metallic, saline, or bituminous minerals. By his bill, the complainant endeavors to confine the terms to a more restricted sense, or definition, than either one of these subordinates ; for he claims a construction should be put upon the words, by the aid of circumstances surrounding the parties, and relating to the subject matter of the grant at the time the grant was made; and by a construction thus derived, he confines the terms not to the metallic ores, but, more limited still, to copper ore alone.
As to the extent to which parol testimony is admissible in giving an interpretation, or proper definition, to the words used here, I have no difficulty. Where a term of art is employed, or a word connected with some department of the natural world, which has become technical and popular in its use among scientific men and men of letters, a court, when called upon to give a construction to such words, may avail itself of parol testimony to ascertain the technical and popular use of the word. But parol testimony is not admissible, under any circumstances, to show that the parties to an instrument of writ *134 ing under seal placed upon a particular word or phraseology which controls the whole effect and value of the writing, any limited or definite meaning for the purposes of that particular instrument. "Where the construction depends upon the definition to he given to any particular words, and there is an ambiguity created from the manner of their use, and in such use the words cannot be said to have any popular or technical scientific meaning, or the learned differ as to such meaning, then the only recourse left is to adopt the next most comprehensive meaning not excluded by the expressed or plain intention of the parties. This is a salutary mode of construction, for, as Mr. J. Blackstone remarks, the principle of self-preservation will make men sufficiently careful not to prejudice their own interest by the too extensive meaning of their words, and hereby all manner of deceit in any grant is avoided; for men would always affect ambiguous and intricate expressions, provided they were afterwards at liberty to put their own construction upon them. 2 Bla. Com. 380. No extrinsic evidence is admissible for the purpose of showing that the grantor intended to confine the words “ mines and minerals” to copper ore only. If the grantor can do this, then it follows he may, by parol evidence, show that the parties fixed-an arbitrary meaning to words upon which the whole efficacy of the deed depends, contrary to their natural and ordinary import and popular acceptation. But the complainant may introduce parol evidence to show the scientific and popular meaning of the words “mines and minerals” under an exception to the general rule. Where any doubt arises upon the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence dehors the instrument itself; for both reason and common sense agree that by no other means can the language of the instrument be made to speak the real mind of the party. Broom’s Legal Maxims 266.
*135 In this case parol evidence is admissible ex necessitate. The ambiguity is created by extrinsic evidence, and it may be removed in the same manner. The allegation is, that the defendants are removing from the complainant’s soil a particular substance or material. The answer is, that the defendants have a right to remove it, because it was conveyed to them under the terms “ mines and minerals.” The complainant rejoins, that those terms did not include the substance in question. The parties must therefore give evidence as to the character of the material, and they may show that it is or is not embraced in the scientific and popular use of the terms employed by the grantor.
The character of the substance, or stone paint, as the witnesses call it, is given in the bill, and the correctness of the description there given is admitted by the answer, and confirmed by the evidence. It is a substance resembling in general appearance red shale, so soft as to be easily cut with a knife when first excavated, but differing in appearance and quality from the surrounding earth. It is found in irregular strata or boulders of various sizes. It hardens when exposed to the air, and when broken up and ground it is used as a paint, and is valuable for that purpose. The manner in which it is procured from the earth, and its particular location below the surface, are particularly described by a witness, who was the foreman in carrying on the works. They commenced working in an old shaft, which had been used for raising copper ore. As they proceeded with the excavation, the dip of the paint stone was about one foot in eight or ten, perhaps a little more. At the point of the pit opposite to the side at which the excavation was commenced the the paint stone was from, eighteen to twenty feet from the surface of the earth. The work was carried on by making regular mine shafts of timber, one of which was extended about fifty-six feet in length, and penetrated about twelve feet in the mountain beyond the open pit. Other pits were made very similar in character. The stratum of the paint *136 stone in the largest pit was found to vary from six to fifteen feet in thickness. The stratum was uniform, increasing in thickness as progress was made into the mountain. It does mot crumble like .red shale, but goes off in square pieces. It is ground in a mill, and is then fit for use, as a paint, by mixing it with oil. Its value is from twenty to thirty dollars per ton.
Professor Doremus is the only scientific witness examined. He says, “ it may be called an argillaceous sandstone, allumina and silica being the prominent ingredients—it is not an ore of iron. This comes under the head of argillaceous rocks. I wish to distinguish these classes from ores or metalliferous rocks. The position of this paint material, as it lies in the mountain, is not in veins, but in strata. The extracting of this material, as I saw it there, would not be called mining.”
I think I have extracted all the facts from the whole case which can shed any light upon this investigation. The analysis only establishes the fact, that this is not a metalliferous ore. If the terms “ mines and minerals,” used in the deed, could, by any fair construction, be confined to metallic substances, the question involved would be of easy solution; for the metallic property found in this paint stone is so small, that for the purpose of extracting the metal it is of no value. But I do not think the terms should be confined to the metals or to metallic ores. I cannot doubt, if a strata of salt, or even a bed of coal, had been found, they would have passed under this grant.
Can this stone paint, then, be fairly and naturally embraced in the term “ mineral ?” It is a body which is destitute of organization, and which naturally exists within the earth. It is below the surface, distinct from the ordinary earth. It is in strata, and is worked by the ordinary means of mining. And although Professor Doremus says that it is not in veins, but in strata, and that he would not call the mode of extracting it mining, yet this test of his *137 would exclude salt from the class of minerals; for salt, too, is found in strata, and not in veins, and is obtained by shafts, and by the same mode of operation by which this material is extracted from the earth. It is valuable for its mineral properties, and, by a cheap and easy process of grinding, is converted into a merchantable article adapted to the mechanical and ornamental arts. It is embraced in the definition given by men of science to the term “mineral.” In BakeweU’s Mineralogy, page 7, it is said “the term mineral, in common life, is generally applied to denote substances dug out of the earth or obtained from mines.” In Cleaveland’s Mineralogy, page 1, the definition is given thus: “ Minerals are those bodies which are destitute of organization, and which naturally exist within the earth or at its surface.” My conclusion is, that this paint stone passed by the grant, and that the defendants have a right to excavate and remove it, and to convert it to their own use.
The position which the complainant occupies in this cause before the court, is one which entitles him to nothing more than strict right. The defendants, “ the President and Directors of the Bridgewater Paint Manufacturing Company,” were organized for the very purpose of procuring this paint stone from the premises, and preparing it for market. Camman conveyed to them, for these purposes, the estate which had boon gx-anted to him by Thomas A. Hartwell. The general title to the land had been conveyed by Thomas A. Hartwell to the complainant, Samuel Swan Hartwell. The complainant became an original stockholder, to the amount of fifty shares, in the company, and still continues to hold those shares. At the commencement of the uixdertaking, it was a matter of doubtful experiment whether this paint stone could be made a valuable article of merchandise. "While a matter of uncertainty, this complainant was a pai’tner, contributing himself, and ixi exicouragiixg others to contribute, to do that which he now complains is an invasion of his free *138 hold. He gave a construction to the grant by his own acts, and encouraged others to expend their money to make this property valuable.
There is another ground upon which the complainant asks the interference of the court on his behalf. He complains that the defendants are disfiguring, removing, and destroying the surface of the premises to a greater extent than is necessary for proper and ordinary mining pul'poses. The evidence does not sustain the allegation. Only one-third of an acre of the surface of the ground has been removed. The value of the land damaged is about eighty-three cents, and that of the wood about three dollars.
The bill must be dismissed with costs.